**PACIFIC TRIAL ATTORNEYS**
A Professional Corporation
Scott J. Ferrell (Bar No. 202091)
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Suite 800
Newport Beach, California 92660
Telephone: (949) 706-6464
Facsimile:  (949) 706-6469

Attorneys for Plaintiff

## UNITED STATE DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GABRIELLA HERNANDEZ, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br> v. <br><br> ASHLEY GLOBAL RETAIL, LLC, a Delaware limited liability company, <br><br> Defendant. | Case No. 2:23-cv-05066-FMO-PD <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT** <br><br> Date:        September 7, 2023 <br> Time:        10:00 a.m. <br> Courtroom:  6D <br> Judge:       Hon. Fernando M. Olguin |

# **TABLE OF CONTENTS**

**Page(s)**

I.  INTRODUCTION ..................................................................................................1

II. ARGUMENT ........................................................................................................1

    A.  Defendant Is a "Video Tape Service Provider" As Defined
        by the VPPA. ...........................................................................................1

        1.  Two Recent Federal District Court Decisions Have
             Construed the Term, "Similar Audio Visual
             Materials," Broadly in the VPPA. ...........................................1

        2.  A Recent Federal District Court Decision Has Cited
             *In re Vizio, Inc., Consumer Privacy Litig.* for the
             Proposition that a Person Need Not Be in the
             Business of Either Renting or Selling Video Content
             for the VPPA to Apply. ...........................................................2

        3.  The FAC Plausibly Alleges the Numerosity and
             Breadth of Defendant's Videos on Its Website. ......................3

        4.  The FAC's Allegations Address Defendant's Use of
             Videos as an Important Marketing Channel. ...........................3

        5.  *Stark v. Patreon, Inc.* Supports Plaintiff's Position. ...........4

        6.  *Jackson v. Fandom, Inc.* Supports Plaintiff's Position. .......5

        7.  *Carroll v. General Mills, Inc.* Is Both Unpersuasive
             and Distinguishable. ................................................................5

        8.  *Crytek GmbH v. Cloud Imperium Games Corp.*
             Supports Plaintiff's Position. ..................................................6

        9.  *Lebakken v. WebMD, LLC* Supports Plaintiff's
             Position. ...................................................................................7

        10. Plaintiff's Interpretation Is Not Overbroad. ..........................8

    B.  Plaintiff Is a "Consumer" as Defined by the VPPA. ..........................8

        1.  The FAC Plausibly Alleges that Plaintiff Is a
             Purchaser of Defendant's Goods. ...........................................8

a.    The Plain Meaning Rule Applies.................................................9

b.    Given that the VPPA Is a Remedial Statute, Its Terms Must Be Liberally Construed. ........................................9

c.    The Legislative History Cited By Defendant Is Unpersuasive in Supporting Defendant's Interpretation of "Purchaser".......................................................9

d.    *Carter v. Scripps Networks, LLC* Is Unpersuasive..............................................................................11

e.    *Hunthausen v. Spine Media, LLC* Is Both Distinguishable and Unpersuasive............................................12

C.    The FAC Sufficiently Alleges Defendant's Disclosure of Plaintiff's Personally Identifiable Information. .............................................13

1.    The FAC Plausibly Alleges Defendant's Knowing Disclosure of PII to a Third Party. .......................................14

2.    *Eichenberger v. ESPN, Inc.* Is Factually Distinguishable.............................................................................14

3.    There Is No Appreciable Distinction Between a Facebook ID, Which Is Consistently Viewed as Constituting PII and the TikTok Pixel's Gathering of a TikTok User's Metadata................................................16

4.    Analytics Tools Collect IP Addresses, Which Are Identifiable. ........................................................................18

D.    If a Curable Defect Remains, Leave to Amend Should Be Granted. ...............................................................................20

III.    CONCLUSION...........................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ambrose v. Boston Globe Media Partners LLC*,
  2022 WL 4329373 (D. Mass. Sept. 19, 2022) ......................................17

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ...............................................................................14

*Belozerov v. Gannett Co., Inc.*,
  2022 WL 17832185 (D. Mass. Dec. 20, 2022) .....................................17

*Cantu v. Tapestry, Inc.*,
  2023 WL 4440662 (S.D. Cal. July 10, 2023) (Bashant, J.) ...............2, 3, 6, 7

*Carroll v. General Mills, Inc.*,
  2023 WL 4361093 (C.D. Cal. June 26, 2023) (Fischer, J.) .............5, 6

*Carter v. Scripps Networks, LLC*,
  2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023) ..................................... 11, 12, 13

*Connecticut Nat'l Bank v. Germain*,
  503 U.S. 249 (1992) .........................................................................9, 12

*Crytek GmbH v. Cloud Imperium Games Corp.*,
  2018 WL 9491965 (C.D. Cal. Dec. 6, 2018) (Gee, J.) ....................6, 7

*Czarnionka v. The Epoch Times Ass'n, Inc.*,
  2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022) ...................................17

*Eichenberger v. ESPN, Inc.*,
  876 F.3d 979 (9th Cir. 2017) ..................................................... *passim*

*Feldman v. Star Tribune Media Company LLC*,
  2023 WL 2388381 (D. Minn. Mar. 7, 2023) .......................................17

*Harris v. Public Broadcasting Serv.*,
  2023 WL 2583118 (N.D. Ga. Mar. 20, 2023) ......................................17

*Hernandez v. Williams, Zinman & Parham PC*,
  829 F.3d 1068 (2016) ............................................................................12

MEM. ISO RESPONSE TO MTN TO DISMISS FAC

*Hunthausen v. Spine Media, LLC*,
- F. Supp. 3d -, 2023 WL 4307163 (S.D. Cal. June 21, 2023)
(Simmons, J.) ...................................................................................12, 13

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) (Chhabria, J.) .........................13

*In re Hulu Privacy Litig.*,
2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) ...................................1, 3

*In re Hulu Privacy Litig.*,
2014 WL 1724344 (N.D. Cal. Apr. 28, 2014)...............................13, 17

*In re Nickelodeon Consumer Privacy Litig.*,
827 F.3d 262 (3d Cir. 2016)................................................ 11, 15, 19

*In re Pharmatrak, Inc.*,
329 F.3d 9 (1st Cir. 2003) ..................................................................18

*In re Vizio, Inc., Consumer Privacy Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017) (Staton, J.)...................2, 3, 4, 6

*Jackson v. Fandom*,
2023 WL 4670285 (N.D. Cal. July 20, 2023) (Tigar, J.) .................2, 5

*Lebakken v. WebMD, LLC*,
2022 WL 16716151 (N.D. Ga. Nov. 4, 2022) ................... 7, 9, 12, 17

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) ...........................................................20

*Louth v. NFL Enterprises LLC*,
2022 WL 4130866 (D.R.I. Sept. 12, 2022) ......................................1, 3

*Mollett v. Netflix, Inc.*,
795 F.3d 1062 (9th Cir. 2015) ...................................................1, 9, 12

*Ratzlaf v. United States*,
510 U.S. 135 (1994)...........................................................................12

*Stark v. Patreon, Inc.*,
- F. Supp. 3d -, 2022 WL 7652166, at *6 (N.D. Cal. Oct. 13, 2022) ......... *passim*

*Tcherepnin v. Knight*,
389 U.S. 332 (1967).............................................................................9

*Wadler v. Bio-Rad Laboratories, Inc.*,
　916 F.3d 1176 (9th Cir. 2019) ....................................................................9, 12

*Yershov v. Gannett Satellite Info Network, Inc.*,
　820 F.2d 482 (1st Cir. 2016)........................................... 14, 15, 19, 20

**California Cases**

*Advanced Transformer Co. v. Superior Court*,
　44 Cal. App. 3d 127 (1974) .................................................................7

**Federal Statutes**

18 U.S.C.
　§ 2710 *et seq.* ...............................................................................1
　§ 2710(a)(1)............................................................. 8, 9, 10, 11
　§ 2710(a)(3)...............................................................10, 13
　§ 2710(a)(4)...................................................................1, 8
　§ 2710(b) .......................................................................17
　§ 2710(b)(1) ...................................................................1
　§ 2710(b)(2) ...................................................................1
　§ 2710(b)(2)(D)...............................................................14
　Video Privacy Protection Act ....................................... *passim*

**California Statutes**

Civil Code
　§ 1798.100 *et seq.* ..........................................................18
　§ 1798.140(v)(1)(A)...........................................................18
　California Consumer Privacy Act..........................................18, 20

**Federal Rules**

Rules of Civil Procedure
　Rule 12(b)(6)...................................................................14
　Rule 15(a)(2)...................................................................20

**Other Authorities**

Senate Report No. 100-599, 100th Cong., 2nd Sess., 1988 U.S.C.C.A.N.
　4342-1, 1988 WL 243503 (Oct. 5, 1988) ......................................9, 10

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

The First Amended Complaint ("FAC") is adequately pleaded under the Video Privacy Protection Act ("VPPA") 18 U.S.C. §§ 2710 *et seq.*, and, thus, the instant Motion, which only challenges three elements, should be denied in its entirety.

## II.   ARGUMENT

"[I]n order to plead a plausible claim under section 2710(b)(1), a plaintiff must allege that (1) a defendant is a "video tape service provider," (2) the defendant disclosed "personally identifiable information concerning any customer" to "any person," (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by section 2710(b)(2)." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015).

### A.   Defendant Is a "Video Tape Service Provider" As Defined by the VPPA.

The FAC plausibly alleges that Defendant is a "video tape service provider" within the meaning of the VPPA.

#### 1.   Two Recent Federal District Court Decisions Have Construed the Term, "Similar Audio Visual Materials," Broadly in the VPPA.

The VPPA defines "video tape service provider" to mean "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, ***or delivery of*** prerecorded video cassette tapes ***or similar audio visual materials*** …." 18 U.S.C. § 2710(a)(4) (emphasis added). Thus, the plain language of the VPPA is not limited to the sale or rental of "prerecorded video cassette tapes." Indeed, federal courts have recognized that the VPPA's legislative history recognized "'Congress' intent to cover new technologies for pre-recorded video content.'" *Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (quoting *In re Hulu Privacy Litig.*, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012)).

Indeed, in *Stark v. Patreon, Inc.*, - F. Supp. 3d -, 2022 WL 7652166, at *6 (N.D. Cal. Oct. 13, 2022), the court noted that, "Courts have generally construed 'similar audio visual materials' ***broadly***, finding that streaming video delivered electronically falls within that definition." *Id.* at *6 (citing cases) (emphasis added). More recently, in *Jackson v. Fandom*, 2023 WL 4670285 (N.D. Cal. July 20, 2023) (Tigar, J.), the court cited *Stark* for its holding. *Jackson*, 2023 WL 4670285, at *3. Thus, *Stark* is not an aberration in broadly construing the term "similar audio visual materials" within the VPPA.

> **2.** **A Recent Federal District Court Decision Has Cited *In re Vizio, Inc., Consumer Privacy Litig.* for the Proposition that a Person Need Not Be in the Business of Either Renting or Selling Video Content for the VPPA to Apply.**

In *Cantu v. Tapestry, Inc.*, 2023 WL 4440662 (S.D. Cal. July 10, 2023) (Bashant, J.), a federal district court cited *In re Vizio, Inc., Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) (Staton, J.) ("*In re Vizio, Inc.*"), for the following proposition:

> "[L]est the word 'delivery' be superfluous, ***a person need not be in the business of either renting or selling video content for the statute to apply***."

*Tapestry*, 2023 WL 4440662, at *8 (quoting *In re Vizio, Inc.*, 238 F. Supp. 3d at 1221) (emphasis added). Not surprisingly, notwithstanding *Tapestry*'s citation of *In re Vizio, Inc.* in support of the proposition that "a person need not be in the business of either renting or selling video content for the [VPPA] statute to apply," *ibid.*, Defendant completely ignores the foregoing proposition of law, which is highly relevant to deciding the instant Motion despite citing *In re Vizio* for a different proposition. (Def.'s Mem. at 10:24-11:3.) Defendant's silence speaks volumes.

Defendant contends that it is "a company that sells furniture." (Def.'s Mem. at 7:8; 7:22.) Defendant's argument reveals that Defendant is, in essence, arguing that the VPPA only applies to itself if it is in the business of either renting or selling video

content.  But, that flatly contradicts what *Tapestry* recently held in quoting *In re Vizio, Inc*., the latter of which is a decision issued by the Court.  Thus, Defendant's interpretation is wrong.

### 3. The FAC Plausibly Alleges the Numerosity and Breadth of Defendant's Videos on Its Website.

Defendant ignores the crucial holding in a recent decision in a similar VPPA action as to precisely why *Tapestry* dismissed the FAC in the instant action:

> "There are no similar allegations in Plaintiff's Complaint that show Defendant's dissemination of video matches either the ***numerosity of pre-recorded videos disseminated by the NFL or the breadth of video material disseminated by a streaming service like Hulu***.  The allegations in *In re Hulu* and *Louth* support a claim that the respective products in each case are 'significantly tailored' to delivering video content.  *In re Vizio*, 238 F. Supp. 3d at 1221.  Plaintiff's allegations, on the other hand, beg for more."

*Tapestry*, 2023 WL 4440662, at *9 (emphasis added).

In contrast to the original Complaint filed in this action, the FAC plausibly alleges numerous pre-recorded videos on the Website.  (FAC ¶¶ 31-41.)  The FAC's description of the content of such videos also shows that such videos encompass a variety of topics. *Ibid.*

Thus, the FAC cures the perceived deficiency in the original Complaint by addressing both the "numerosity" of pre-recorded videos disseminated by Defendant on its Website and the "breadth" of such videos.

Defendant's refusal to acknowledge the foregoing, (Def.'s Mem. at 11:4-16), speaks volumes.  Defendant's analysis completely ignores the numerosity of the videos available to consumers to watch on its Website and the breadth of such videos.  The decisions in *Louth* and *In re Hulu* both support the plausibility of the FAC's allegations that Defendant has functioned as a video tape service provider within the meaning of the VPPA.

### 4. The FAC's Allegations Address Defendant's Use of Videos as an Important Marketing Channel.

The FAC alleges in detail precisely how and why Defendant uses videos as a highly important marketing channel as demonstrated by how it operates its channels on social media platforms, (FAC ¶¶ 43-44), the fact that it has a job search for "two marketing managers" and a "creative production manager" who will be tasked with "management of all video production for advertising and marketing materials," (FAC ¶ 42), and has relied upon social media advertising, including video, to increase its sales in recent years, (FAC ¶ 45).

The FAC's allegations plausibly demonstrate that the Website is not only substantially involved in the conveyance of video content to consumers, but also significantly tailored to serve that purpose. *In re Vizio*, 238 F. Supp. 3d at 1221. The FAC's allegations are far more robust and clearly differentiate Defendant from the hypothetical letter carrier in *In re Vizio*, whose job duties were not in any way "tailored to delivering packages that contain videotapes as opposed to any other package". *Id.* Thus, Defendant's delivery of videos on its Website to consumers is not a "peripheral" or secondary or tertiary form of marketing for Defendant's business. Defendant's contention that it was merely "peripherally involved" in delivering videos to consumers, (Def.'s Mem. at 7:23), is simply wrong.

### 5. *Stark v. Patreon, Inc.* Supports Plaintiff's Position.

*Stark v. Patreon, Inc.*, - F. Supp. 3d -, 2022 WL 7652166, at *7 (N.D. Cal. Oct. 13, 2022), supports Plaintiff's position because the court noted:

> "*[I]t is reasonable to think that developing a website to deliver video content requires more significant 'tailor[ing] to serve that purpose' than a package delivery service shipping videocassettes along with other physical goods*. *See id.* at 1221. That third-party 'creators' may also be involved in developing and delivering the videos at issue does not absolve Patreon of liability—'a defendant can be 'engaged in the business' of delivering video content even if other actors also take part in the delivery of the same video content.' *Id.* Nothing in Patreon's terms of use or other policies offered for judicial notice dispels the

inference that Patreon 'delivers' videos through its platform, even if those videos are created by third parties."

*Stark*, 2022 WL 7652166, at *7 (emphasis added).  Thus, *Stark* supports Plaintiff's position that developing a website to deliver video content requires far more "tailoring" to serve that purpose than a hypothetical letter carrier shipping video cassettes or DVDs and other physical goods to consumers.  Notably, the instant Motion makes no attempt at all to distinguish *Stark*, let alone, acknowledge its existence.  Defendant's omission speaks volumes.

### 6. *Jackson v. Fandom, Inc.* Supports Plaintiff's Position.

The recent decision in *Jackson v. Fandom, Inc.*, 2023 WL 4670285 (N.D. Cal. July 20, 2023) (Tigar, J.), supports Plaintiff's position.  *Jackson* involved a VPPA action against an operator of a gaming and entertainment website in which the court held that the plaintiff had plausibly alleged that the defendant was a video tape service provider under the VPPA despite the defendant's argument that it provides access to all of materials on its website for free.  *Id.* at *3.  The court held that "video-hosting websites need not charge fees to viewers to qualify as video tape service providers under the VPPA." *Id.*

Assuming that the defendant in *Jackson* accurately portrayed its website as not charging fees to viewers for ***any*** of its online content, it is impossible to differentiate the defendant therein from Defendant in the instant action.

Thus, Defendant's mantra that its Website offers "free" videos to the public to watch, (Def.'s Mem. at 7:9, 7:14; 7:23; 13:2), is not dispositive.  Plaintiff need not "pay for the video," (Def.'s Mem. at 7:1), in order for Defendant to qualify as a "video tape service provider" under the VPPA.  Defendant's assumption that only streaming service providers such as Netflix can ever be subject to the VPPA, (Def.'s Mem. at 8:2), because Netflix charges money for its services does not comport with decisions like *Jackson*.

### 7. *Carroll v. General Mills, Inc.* Is Both Unpersuasive and

**Distinguishable.**

Defendant's reliance upon *Carroll v. General Mills, Inc.*, 2023 WL 4361093 (C.D. Cal. June 26, 2023) (Fischer, J.), is misplaced as *General Mills* is both unpersuasive and distinguishable. First, *General Mills* made no attempt to address the relevance regarding the ***numerosity*** of videos on the defendant's websites at issue therein. Nor did *General Mills* attempt to address the breadth of videos on such websites as relevant to its inquiry. Thus, *General Mills* failed to consider two highly relevant factors, unlike this Court.

In addition, *General Mills* held that, "The few allegations in the FAC about General Mills' business are conclusory and, at most, indicate that General Mills provides videos as a ***peripheral part of its marketing strategy***." 2023 WL 4361093, at *3 (emphasis added). "Nothing suggests that Defendant's business is centered, tailored, or focused around providing and delivering audiovisual content." *Id.* at *4. To the extent that *General Mills* implied that the defendant therein could not be a "video tape service provider" under the VPPA unless it was in the business of either renting or selling video content, *General Mills* erred. As mentioned above, "[L]est the word 'delivery' be superfluous, ***a person need not be in the business of either renting or selling video content for the statute to apply***." *Tapestry*, 2023 WL 4440662, at *8 (quoting *In re Vizio, Inc.*, 238 F. Supp. 3d at 1221) (emphasis added).

*General Mills* addressed a pleading that did not go into detail about either the numerosity or the breadth of the videos displayed on the websites at issue therein, and there was apparently little attempt to plausibly show that videos were anything other than a "peripheral part of" the defendant's "marketing strategy." *General Mills*, 2023 WL 4361093, at *3. Thus, *General Mills* offers little guidance applicable here in light of the fact that the FAC's allegations are completely different than the allegations at issue in *General Mills*.

**8.** ***Crytek GmbH v. Cloud Imperium Games Corp.*** **Supports Plaintiff's Position.**

In *Crytek GmbH v. Cloud Imperium Games Corp.*, 2018 WL 9491965, at *4 (C.D. Cal. Dec. 6, 2018) (Gee, J.), which conducted a contractual interpretation of the phrase, "engage in the business of," in resolving a contractual dispute, that decision cited and relied upon *Advanced Transformer Co. v. Superior Court*, 44 Cal. App. 3d 127, 139 (1974), which interprets "engaged in the business" to have a "a wide variety of meanings," "[b]ut the court limits those meanings to 'almost any activity engaged in for profit with *frequency and continuity*.'" *Id.* (emphasis in original). Thus, the Court in *Crytek* relied upon the "frequency and continuity" of the activity engaged in as crucial to its contractual interpretation.

The analysis in *Crytek* applies here. Given the sheer volume of videos posted on the Website, (FAC ¶¶ 31-41), one can and should reasonably infer from the FAC's allegations that Defendant has posted videos for consumers to watch "with frequency and continuity." Thus, *Crytek* supports Plaintiff's position.

### 9. *Lebakken v. WebMD, LLC* Supports Plaintiff's Position.

The decision in *Lebakken v. WebMD, LLC*, 2022 WL 16716151 (N.D. Ga. Nov. 4, 2022), supports Plaintiff's position because: (1) none of the website content at issue therein, including the online videos, cost any consumers any money; and (2) the website in *Lebakken* did not post videos to preview or advertise its own subscription-based video service like Netflix, Hulu, or Disney+. The website at issue in *Lebakken* was a free website, which "generates review through advertising on its website." *Lebakken*, 2022 WL 16716151, at *1. Notably, *Tapestry* distinguished *Lebakken* as a decision in which consumers received an e-newsletter, "which *frequently* contained video content". *Tapestry*, 2023 WL 4440662, at *9 (emphasis added) (quoting *Lebakken*, 2022 WL 16716151, at *2). In other words, *Tapestry* cited *Lebakken* because it supported *Tapestry*'s analysis holding that numerosity of videos is a relevant factor.

In contrast, Defendant makes no attempt to cite *Tapestry*'s citation of *Lebakken* for its reliance on the frequency of the video content contained therein. This demonstrates that Defendant is ignoring the clear import of *Lebakken*.

### 10. Plaintiff's Interpretation Is Not Overbroad.

Finally, Defendant's contention that Plaintiff's interpretation would extend VPPA liability to a limitless array of businesses and industries, (Def.'s Mem. at 13:3-7), ignores that the VPPA has defined the "video tape service provider" to "any person, engaged in the business, in or affecting *interstate or foreign commerce*," as part of its definition. 18 U.S.C. § 2710(a)(4) (emphasis added). What Defendant does not say is that Plaintiff's interpretation would apply the VPPA to website owners/operators with *no commercial interest* (such as a non-profit entity), which are clearly beyond the scope of the VPPA. Nor does the VPPA extend to a business that is not involved in interstate commerce. As such, Plaintiff's interpretation of meaning of "video tape service provider" is not overbroad as claimed by Defendant.

### B. Plaintiff Is a "Consumer" as Defined by the VPPA.

The VPPA defines the term "consumer" to mean "any renter, *purchaser*, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1) (emphasis added). Defendant's contention that Plaintiff is not a "consumer" within the meaning of the VPPA should be rejected for at least two reasons.

### 1. The FAC Plausibly Alleges that Plaintiff Is a Purchaser of Defendant's Goods.

The VPPA defines the term "consumer" in relevant part to mean "any … *purchaser* … of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1) (emphasis added). The term, "purchaser," in the VPPA is both undefined and unlimited. Notably, the VPPA does not define or restrict the meaning of the term, "purchaser," to a person who buys any goods or services *constituting audio visual materials*. That is, the missing term, "audio visual materials," does not modify the term "purchaser" in 18 U.S.C. § 2710(a)(1). If Congress intended that meaning, Congress easily could have included such modifier explicitly. Defendant's interpretation, which attempts to read into the VPPA's plain language an interpretation that is unsupported, is without merit.

1

### a.     The Plain Meaning Rule Applies.

2 Defendant ignores the well-established rule that a plain meaning analysis applies

3 to statutory interpretation if there is no ambiguity in the statutory language. *Connecticut*

4 *Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are

5 unambiguous, then, this first canon is also the last:  'judicial inquiry is complete.'")

6 (citation omitted).

7 The FAC alleges that Plaintiff has purchased products from Defendant in the past.

8 (FAC ¶ 23.)  That allegation surely suffices to make Plaintiff a "purchaser" of "goods"

9 from a "video tape service provider."  18 U.S.C. § 2710(a)(1).

10

11

### b.     Given that the VPPA Is a Remedial Statute, Its Terms Must Be Liberally Construed.

12 As a remedial statute, the VPPA must be liberally construed in favor of the

13 consumer in order to effectuate the goal of eliminating abuse of personal privacy in

14 requesting or watching audio visual materials. *Wadler v. Bio-Rad Laboratories, Inc.*,

15 916 F.3d 1176, 1187 (9th Cir. 2019) ("It is a 'familiar canon of statutory construction

16 that remedial legislation should be construed broadly to effectuate its purposes[.]'")

17 (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)); *Mollett*, 795 F.3d at 1065.

18 "[T]he phrase 'goods or services' is generally construed broadly to encompass 'all parts

19 of the economic output of society.'"  *Lebakken*, 2022 WL 16716151, at *3.  The VPPA

20 should be liberally construed to vindicate its purpose, which is to protect the privacy

21 rights of individuals.

22

23

24

### c.     The Legislative History Cited By Defendant Is Unpersuasive in Supporting Defendant's Interpretation of "Purchaser".

25 Defendant's reliance upon a snippet of legislative history reflected in Senate

26 Report No. 100-599, 100th Cong., 2nd Sess., 1988 U.S.C.C.A.N. 4342-1, 1988 WL

27 243503 (Oct. 5, 1988) ("Senate Report"), is unpersuasive to support its narrow

28

MEM. ISO RESPONSE TO MTN TO DISMISS FAC

interpretation of the term "purchaser" within section 2710(a)(1). Defendant relies upon the following emphasized portion of such Senate Report:

> "The term 'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider. Unlike the other definitions in this subsection, paragraph (a)(3) uses the word 'includes' to establish a minimum, but not exclusive, definition of personally identifiable information. The definition of personally identifiable information includes the term 'video' ***to make clear that simply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill. For example, a department store that sells video tapes would be required to extend privacy protection to only those transactions involving the purchase of video tapes and not other products***."

Senate Report No. 100-599, 100th Cong., 2nd Sess., 1988 U.S.C.C.A.N. 4342-1, 1988 WL 243503 (Oct. 5, 1988) (emphasis added)

The quoted language above is unremarkable because it merely clarifies that, in the specific context of a business that is engaged in the sale or rental of video materials or services (among other goods or services), the VPPA is not intended to extend privacy protections to ***all*** sale or rental transactions whereby ***all*** goods or services are rented or purchased from such business.

For example, if the hypothetical department store described in the Senate Report sells clothing, such store would not be required to extend privacy protection to transactions involving the purchase of such clothing goods. Similarly, if that store sells a major appliance such as refrigerator, such store would not be required to extend privacy protection to such transactions. Although such non-video related transactions may seem trivial in terms of the necessity of privacy protections and not worthy of discussion within the Senate Report, imagine a fact pattern whereby a department store (or its rogue employee) decided to disclose to the news media in 1988 (or social media

in modern times) the history of purchases made at such department store including the purchase of intimate apparel, *e.g.*, underwear, lingerie, etc., by Judge Bork's family members.[1] Surely, there would have been a hue and cry of moral outrage if such information had been disclosed to the public in 1988. Nevertheless, the disclosure of such non-video related information of transactions would not have been covered by the limited scope of the VPPA, which is limited to imposing privacy protections on video-watching behavior. Instead, Judge Bork and his family members would have had to resort to relying upon other federal or state privacy statutes (or state constitutional provisions) to protect their personal privacy had such hypothetical disclosure occurred. That is merely what the Senate Report was surely intended to convey. As such, the quoted language in the Senate Report is not supportive of Defendant's position in narrowly interpreting the term, "subscriber."

### d. *Carter v. Scripps Networks, LLC* Is Unpersuasive.

Although Defendant relies upon *Carter v. Scripps Networks, LLC*, 2023 WL 3061858, at *4-*7 (S.D.N.Y. Apr. 24, 2023), that decision is distinguishable because the plaintiffs in that decision did not allege that they were a "purchaser" of the defendants' goods or services. *Carter* noted, "There is no suggestion that plaintiffs purchased or rented a covered good or service from HGTV." *Carter*, 2023 WL 3061858, at *4. The complaint in *Carter* merely alleged that the plaintiffs were "consumers" "because they subscribed to HGTV's newsletter." *Id.* at *2. Thus, *Carter*'s analysis is limited to interpreting the term, "subscriber," in the VPPA statute, 18 U.S.C. § 2710(a)(1).

Second, *Carter* ignores the well-established rule that a plain meaning analysis applies to statutory interpretation if there is no ambiguity in the statutory language.

---

[1] The VPPA was enacted after a newspaper published the video rental history of Supreme Court nominee Robert Bork's family. "The paper had obtained (without Judge Bork's knowledge or consent) a list of the 146 films that the Bork family had rented from a Washington, D.C.-area video store." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 278 (3d Cir. 2016). Thus, Defendant's contention that Judge Bork personally rented 146 films from a particular video store, (Def.'s Mem. at 7:3-4), is inaccurate. The rental list applied to his entire family, which presumably included his spouse and adult children living at home.

*Connecticut Nat'l Bank*, 503 U.S. at 254 ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'") (citation omitted); *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear.").

Third, *Carter* acknowledges, "***The statute does not limit or qualify 'goods or services' to video materials***." *Carter*, 2023 WL 3061858, at *5 (emphasis added). As mentioned above, "[T]he phrase 'goods or services' is generally construed broadly to encompass 'all parts of the economic output of society.'" *Lebakken*, 2022 WL 16716151, at *3. Given the foregoing acknowledgment in *Carter*, **which Defendant conveniently omits to mention**, its resort to a statutory interpretation going beyond the plain meaning of the statutory language was improper.

Fourth, *Carter*'s reliance upon the same exact snippet of legislative history in the Senate Report analyzed above, *Carter*, 2023 WL 3061858, at *6, is misplaced for the same reasons set forth above.

Fifth, *Carter* erred by failing to liberally construe the VPPA, whose purpose is to protect personal privacy. *Wadler*, 916 F.3d at 1187; *Mollett*, 795 F.3d at 1065; *cf.* *Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1078-79 (9th Cir. 2016). Even with respect to *Carter*'s analysis of the "subscriber" term, which is not at issue herein, *Carter* made no attempt to interpret the "subscriber" term in the VPPA broadly in furtherance of Congress's goal to protect the privacy rights of individuals. Instead, *Carter*'s extremely narrow interpretation of a "subscriber" surely frustrates the privacy-related goal underlying the VPPA's enactment.

### e.    *Hunthausen v. Spine Media, LLC* **Is Both Distinguishable and Unpersuasive.**

Defendant's reliance upon *Hunthausen v. Spine Media, LLC*, - F. Supp. 3d -, 2023 WL 4307163 (S.D. Cal. June 21, 2023) (Simmons, J.), is both distinguishable and unpersuasive.

*Spine Media* is distinguishable because the court found that "Plaintiff appears to admit that he did not purchase anything directly from Defendant, but rather from third parties." *Id.* at *3.

*Spine Media*, which relied heavily upon *Carter*, *id.*, is equally unpersuasive for the same overlapping reasons.

First, *Spine Media* ignores the well-established rule that a plain meaning analysis applies to statutory interpretation if there is no ambiguity in the statutory language.

Second, *Spine Media* failed to acknowledge that *Carter* itself acknowledged, "***The statute does not limit or qualify 'goods or services' to video materials***." *Carter*, 2023 WL 3061858, at *5 (emphasis added).

Third, although *Spine Media* did not expressly rely upon the same snippet of legislative history cited by *Carter*, it is reasonable to assume that *Spine Media* implicitly did so given that it specifically cited to the portion of *Carter* containing *Carter*'s analysis of legislative history. *Spine Media*, 2023 WL 4307163, at *3 (citing *Carter*, 2023 WL 3061858, at *6).

Fourth, *Spine Media* erred by failing to liberally construe the VPPA.

**C.      The FAC Sufficiently Alleges Defendant's Disclosure of Plaintiff's Personally Identifiable Information.**

The VPPA "broadly" defines the term "personally identifiable information" as including "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 798 (N.D. Cal. 2019) (Chhabria, J.) (citing 18 U.S.C. § 2710(a)(3)). "The statute does not require an actual name and requires only something akin to it." *In re Hulu Privacy Litig.*, 2014 WL 1724344, at *14 (N.D. Cal. Apr. 28, 2014). As the Ninth Circuit has put it, personal identifiable information ("PII") is "information that would 'readily permit an ordinary person to identify a specific individual's video-watching behavior.'" *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017).

1.   **The FAC Plausibly Alleges Defendant's Knowing Disclosure of PII to a Third Party.**

The FAC alleges Defendant's disclosure of Plaintiff's PII to TikTok via the TikTok Pixel and Defendant's knowledge of such disclosures. (FAC ¶¶ 14-22.) The FAC alleges that Defendant has disclosed Plaintiff obtaining specific video materials from the Website via the TixTok Pixel. *Id.* ¶¶ 19-22. The FAC alleges that Defendant reports each visitor to its Website's video-watching behavior to TikTok via the TikTok Pixel. (FAC ¶ 22.)

The Court is required to take as true the foregoing allegations for purposes of the instant Motion. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations") (citation omitted).

2.   ***Eichenberger v. ESPN, Inc.* Is Factually Distinguishable.**

Although the Ninth Circuit adopted the "ordinary person" test in *Eichenberger*, the Ninth Circuit expressly noted that its holding does not "make the [VPPA] statute powerless." *Id.* at 986. The Ninth Circuit began by noting, "Names and addresses, of course, still qualify." *Id.* (citing 18 U.S.C. § 2710(b)(2)(D)). Significantly, the Ninth Circuit added, "It is not difficult to imagine other examples that may also count—for example, an individual's name and telephone number or an individual's name and birthday or, as in *Yershov[ v. Gannett Satellite Info Network, Inc.*, 820 F.2d 482 (1st Cir. 2016)], *the GPS coordinates of a particular device*." *Id.* (emphasis added). Notably, although the Ninth Circuit noted that *Yershov* adopted a different test, the Ninth Circuit expressly noted that "[o]ur decision today … does not necessarily conflict with *Yershov*." *Id.* The Ninth Circuit viewed *Yershov* as consistent with its own decision because the First Circuit "relied, in part, on the nature of GPS location data, which the court noted 'would enable *most people* to identify [an individual's home and work addresses].'" *Eichenberger*, 876 F.3d at 986 (emphasis in original) (quoting *Yershov*, 820 F.3d at 486). Needless to say, in 2017 when *Eichenberger* was decided and even to

this day, "most people" were and surely are incapable of using "GPS location data" in isolation by itself to identify a particular address. That is, "most people" surely do not have the ability to make use of GPS coordinates solely from memory or personal experience. Thus, for the Ninth Circuit to nevertheless hold that *Yershov* is compatible with its ordinary person test strongly suggests that *Eichenberger*'s ordinary person test is compatible with resort to some additional resources or investigative tools including computer technology in identifying a specific individual's video-watching behavior.

Indeed, even in *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262 (3d Cir. 2016), which is the basis for the Ninth Circuit's ordinary person test, the Third Circuit itself construed its own ordinary person test to cover circumstances whereby an ordinary recipient is able to identify a particular person's video-watching habits "with ***little*** or no extra effort." 827 F.3d at 284 (emphasis added). If the Third Circuit intended for the scope of the VPPA to be restricted to an ordinary person who can identify a particular person's video-watching behavior with "no extra effort," then why did the Third Circuit include the word "little" as part of its crucial holding construing congressional intent? This Court should not construe the Third Circuit's inclusion of the word "little" in its holding as meaningless surplusage.

Significantly, the Ninth Circuit added:

"And ***modern technology may indeed alter—or may already have altered—what qualifies under the statute***. ***A Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual.*** We need not and do not opine on the merits of those theories. The allegations before us, though, are simply too attenuated to qualify under the standard that we adopt today."

*Eichenberger*, 876 F.3d at 986 (emphasis added). Thus, *Eichenberger* did not restrict what qualifies as PII to information that could identify an individual's video viewing behavior via only technology that existed in 1988. It narrowly held that the defendant's disclosure of the consumer's Roku device serial number with the names of the videos that the plaintiff watched to a third party, Adobe Analytics, was insufficient because that

"information *cannot* identify an individual unless it is combined with other data in Adobe's possession…." *Id.* at 986 (emphasis in original).  Significantly, the Ninth Circuit relied upon the plaintiff's allegation that "Adobe can identify individuals only because it uses a complex 'Visitor Stitching technique' to link an individual's Roku device number with other identifying information derived from 'an enormous amount of information' **collected 'from a variety of sources**.'" *Id.* (emphasis added).

Here, in contrast, TikTok, the alleged third party to whom Defendant disclosed Plaintiff's PII to via the TikTok Pixel software tool, has no need to collect information "from a variety of sources" to identify Plaintiff's identity because it is reasonable to infer from the FAC's allegations that TikTok's embedded software code identifies all TikTok account holders when they signed up for a TikTok account in order to be able to track their online behavior including what advertisement a TikTok user has clicked. (FAC ¶¶ 15-16.)  Indeed, TikTok has over 150 million American users.  (FAC ¶ 7.)

Thus, the factual allegations at issue in the instant action are totally dissimilar to the alleged facts at issue in *Eichenberger* in which the alleged third party recipient of the plaintiff's PII had to gather identifying information collected "from a variety of sources" in order to make use of the plaintiff's Roku device number to identify such individual. That is a significant distinction that makes *Eichenberger* factually distinguishable.

### 3. There Is No Appreciable Distinction Between a Facebook ID, Which Is Consistently Viewed as Constituting PII and the TikTok Pixel's Gathering of a TikTok User's Metadata.

As mentioned above, the Ninth Circuit expressly stated that it was not deciding whether a Facebook link would enable an "ordinary person" to identify an individual at the same time that it noted that "modern technology may indeed alter—or may already have altered—what qualifies under the statute." *Eichenberger*, 876 F.3d at 986 ("[a] Facebook link … may very well readily enable an 'ordinary person' to identify an individual."), *quoted in Stark*, 2022 WL 7652166, at *7.  Notably, Defendant has conveniently omitted this portion of *Eichenberger* from its Memorandum despite citing

*Eichenberger* for other propositions.  (Def.'s Mem. at 15:18-19.)  This begs the question as to what other federal courts have decided regarding whether the Facebook ID constitutes PII.

Notably, multiple federal courts have recognized as plausible the allegation that the Facebook ID itself constitutes PII.  *Feldman v. Star Tribune Media Company LLC*, 2023 WL 2388381, at \*8-\*10 (D. Minn. Mar. 7, 2023); *Belozerov v. Gannett Co., Inc.*, 2022 WL 17832185, at \*3 (D. Mass. Dec. 20, 2022) ("A Facebook ID meets the broad definition of PII in this circuit") ("A Facebook ID is a unique identifier that allows anyone to discover the user's identity."); *Czarnionka v. The Epoch Times Ass'n, Inc.*, 2022 WL 17069810, at \*4 (S.D.N.Y. Nov. 17, 2022); *Lebakken*, 2022 WL 16716151, at \*4; *Stark*, 2022 WL 7652166, at \*7-\*8; *Ambrose v. Boston Globe Media Partners LLC*, 2022 WL 4329373, at \*2 (D. Mass. Sept. 19, 2022); *In re Hulu Privacy Litig.*, 2014 WL 1724344, at \*14 ("The Facebook User ID is more than a unique, anonymous identifier. ***It personally identifies a Facebook user***.  That it is a string of numbers and letters does not alter the conclusion.  Code is a language, and languages contain names, and the string is the Facebook user name.") (emphasis added) (finding a material issue of fact that the information transmitted to Facebook was sufficient to identify individual consumers); *see also Harris v. Public Broadcasting Serv.*, 2023 WL 2583118, at \*5 (N.D. Ga. Mar. 20, 2023) ("it is the bundling of the [Facebook ID] from the c_user cookie with the URLs of the videos Plaintiff watched that matters [to establish liability under the VPPA]").[2]

---

[2]  The above-mentioned decisions that recognize that a Facebook ID constitutes PII similarly recognize as plausible the allegation that a defendant website operator programmed the Facebook Pixel into its website code satisfies the "knowingly discloses" element of VPPA in 18 U.S.C. § 2710(b).  *Harris*, 2023 WL 2583118, at \*7; *Feldman*, 2023 WL 2388381, at \*10; *Belozerov*, 2022 WL 17832185, at \*4; *Czarnionka*, 2022 WL 17069810, at \*4; *Lebakken*, 2022 WL 16716151, at \*4-\*5; *Stark*, 2022 WL 7652166, at \*7-\*8; *Ambrose*, 2022 WL 4329373, at \*2.  "By installing the Pixel, Defendant opened a digital door and invited Facebook to enter that door and extract information from within."  *Czarnionka*, 2022 WL 17069810, at \*3.  "[A]rguing that transmitting cookies is just the normal way that webpages … load is not enough to negate knowledge or show the absence of evidence about knowledge."  *In re Hulu Privacy Litig.*, 2014 WL 1724344, at \*16.  Defendant deliberately tracks videos that

Continued on the next page

The TikTok Pixel used by TikTok operates functionally just like an unencrypted Facebook ID operates, which is contained in a c_user cookie. As such, the fact that numerous federal district courts have interpreted a Facebook ID as constituting PII under the VPPA lends support for the proposition that the TikTok Pixel captures user metadata that constitutes PII. After all, if a Facebook ID is treated as PII to an ordinary person, then why shouldn't TixTok Pixel, which identifies a specific TikTok account, be treated as PII too?

### 4. Analytics Tools Collect IP Addresses, Which Are Identifiable.

Although Defendant contends that an ordinary person could not make use of the user data gathered by the TikTok Pixel to identify a specific TikTok account, (Def.'s Mem. at 15:15-16:14), Defendant is wrong.

An Internet Protocol ("IP") address is a set of numbers that helps computers talk to each other on the internet. An IP address is akin to a phone number or mailing address for computers. "An IP address is the unique address assigned to every machine on the internet. An IP address consists of four numbers separated by dots, e.g., 166.132.78.215." *In re Pharmatrak, Inc.*, 329 F.3d 9, 13 n.1 (1st Cir. 2003).

IP addresses are generally considered personally identifiable information. The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.100 *et seq.*, along with many other privacy regulations consider IP addresses personally identifiable information. *See, e.g.*, Cal. Civ. Code § 1798.140(v)(1)(A) ("'Personal information' means information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household. Personal information includes, but is not limited to, the following if it identifies, relates to, describes, is reasonably capable of being associated

---

Continued from the previous page

visitors to its Website watch, and reports the video-viewing behavior of such visitors and the titles watched by its Website visitors to TikTok. (FAC ¶ 22.) That surely suffices to plausibly allege that Defendant knowingly disclose Plaintiff's PII to a third party, *i.e.*, TikTok.

with, or could be reasonably linked, directly or indirectly, with a particular consumer or household:   (A) Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, **Internet Protocol address**, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.") (emphasis added).

There are currently dozens of services called "identity resolution" that an ordinary individual can use to determine the end user associated with a given IP address. Examples include: Mobilewalla, Versium, Acxiom, and LiveRamp.   It is a relatively common practice for an "identity resolution" vendor to offer free resolution services on test sets of data to prove the value of the vendor's services.   The existence of the "identity resolution" industry in 2023 is beyond dispute.

An ordinary person could create a list of IP addresses and use an identity resolution service to determine the end user(s) who watched a video.   Although the foregoing information is not set forth in the FAC, Plaintiff is amenable to amending the FAC to plead it.

Notably, *Eichenberger* did not consider whether the disclosure of an IP address to a third party constitutes PII, nor did *Eichenberger* consider the existence of the "identity resolution" industry that now exists in 2023.   Similarly, the Third Circuit did not address the existence of an "identity resolution" industry in its decision in *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d at 281-290.   Given the existence of such industry now, the disclosure of Plaintiff's IP address would surely permit an ordinary recipient to identify a particular person's video-watching habits "with **little** or no extra effort."   827 F.3d at 284 (emphasis added).

Indeed, given that the Ninth Circuit has indicated that GPS coordinates are sufficient to permit an ordinary recipient to identify a particular person's video-watching habits, *Eichenberger*, 876 F.3d at 986,[3] which surely requires a "little … effort" by using

---

[3] As mentioned above, the Ninth Circuit viewed *Yershov* as consistent with its own decision because the First Circuit "relied, in part, on the nature of GPS location data,
Continued on the next page

either a GPS device or a computer software program, a comparable level of effort is now needed to make use of an IP address to identify a computer user.  That is surely why modern computer privacy statutes such as the CCPA recognize IP addresses as personal information.

### D.     If a Curable Defect Remains, Leave to Amend Should Be Granted.

If the Court is inclined to grant the instant Motion, this Court should grant Plaintiff leave to amend to file a Second Amended Complaint.  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000); Fed. R. Civ. P. Rule 15(a)(2).

### III.    CONCLUSION

Based upon the foregoing reasons, it is respectfully requested that the Court deny the Motion and grant such further and other relief as the Court deems appropriate and necessary.

Dated:  August 17, 2023                    PACIFIC TRIAL ATTORNEYS, P.C.
Scott J. Ferrell

By: */s/ Scott J. Ferrell*

Scott. J. Ferrell
Attorneys for Plaintiff

---

Continued from the previous page

which the court noted 'would enable *most people* to identify [an individual's home and work addresses].'"  *Eichenberger*, 876 F.3d at 986 (emphasis in original) (quoting *Yershov*, 820 F.3d at 486).

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2023, I electronically filed the foregoing **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

Dated:  August 17, 2023

           */s/ Scott J. Ferrell*
              Scott J. Ferrell